UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE, 1600 AMPHITHEATRE PARKWAY, MOUNTAIN VIEW, CALIFORNIA 94043 | **FILED UNDER SEAL**<br><br>Case No.   21-mj-152-01-AJ |

## AFFIDAVIT

I, John Forte, having been duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a warrant to search information that is stored at premises controlled by Google, an electronic communication service and remote computing service provider headquartered in Mountain View, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Google to disclose to the government the information further described in Attachment B.I.  The government will then review that information and seize the information that is further described in Attachment B.II.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice, and have been so employed since 2002. I am currently assigned to the ATF Boston Field Division, Manchester, New Hampshire Field Office, and charged with investigating criminal offenses involving the federal firearms, explosives, arson, alcohol, and tobacco diversion laws.

3.      I have received extensive training in the federal firearms laws and am familiar with ATF's regulations regarding the purchase and sales of firearms.  I have successfully

1

completed the Criminal Investigations Training Program and the ATF New Professional

Training (NPT) at the Federal Law Enforcement Training Center in Glynco, GA.  During the

NPT program, I learned how to investigate criminal offenses involving the federal firearms,

explosives, arson, alcohol, and tobacco diversion laws.  I have received advanced training with

regard to conducting complex firearms trafficking investigations.  I have participated in dozens

of investigations relating to the illegal acquisition and sales of firearms, the illegal manufacture

and possession of National Firearms Act weapons and previously have sworn out numerous

affidavits in support of search warrants and arrest warrants in firearms cases.  I have been

certified as an Interstate Nexus Expert, that is, an expert in establishing whether particular

firearms or ammunition have traveled in interstate commerce thereby satisfying the interstate

commerce element of many federal firearms crimes.

4.      Based on the facts set forth in this affidavit, there is probable cause to search the

information described in Attachment A for evidence of violations of Title 18, United States

Code, Section 2, conspiracy, and Title 18, United States Code, Section 924(m), theft of a

firearm(s) from a Federal firearms licensee (hereinafter, "FFL").  Based on the facts set forth in

this affidavit, I submit there is probable cause that violations of 18 U.S.C. §§ 2, 924(m) occurred.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of

competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) &

(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has

jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND RELATING TO GOOGLE AND RELEVANT TECHNOLOGY

6.      Based on my training and experience, I know that cellular devices, such as mobile

telephones, are wireless devices that enable their users to send or receive wire and/or electronic communications using the networks provided by cellular service providers.  Using cellular networks, users of many cellular devices can send and receive communications over the Internet.

7.      I also know that many devices, including but not limited to cellular devices, have the ability to connect to wireless Internet ("wi-fi") access points if the user enables wi-fi connectivity.  These devices can, in such cases, enable their users to send or receive wire and/or electronic communications via the wi-fi network.  A tablet such as an iPad is an example of a device that may not have cellular service but that could connect to the Internet via wi-fi.  Wi-fi access points, such as those created through the use of a router and offered in places like homes, hotels, airports, and coffee shops, are identified by a service set identifier ("SSID") that functions as the name of the wi-fi network.  In general, devices with wi-fi capability routinely scan their environment to determine what wi-fi access points are within range and will display the names of networks within range under the device's wi-fi settings.

8.      Based on my training and experience, I also know that many devices, including many cellular and mobile devices, feature Bluetooth functionality.  Bluetooth allows for short-range wireless connections between devices, such as between a device such as a cellular phone or tablet and Bluetooth-enabled headphones.  Bluetooth uses radio waves to allow the devices to exchange information.  When Bluetooth is enabled, a device routinely scans its environment to identify Bluetooth devices, which emit beacons that can be detected by devices within the Bluetooth device's transmission range, to which it might connect.

9.      Based on my training and experience, I also know that many cellular devices, such as mobile telephones, include global positioning system ("GPS") technology.  Using this technology, the device can determine its precise geographical coordinates.  If permitted by the

user, this information is often used by apps installed on a device as part of the apps' operation.

10.     Based on my training and experience, I know Google is a company that, among other things, offers an operating system ("OS") for mobile devices, including cellular phones, known as Android.  Nearly every device using the Android operating system has an associated Google account, and users are prompted to add a Google account when they first turn on a new Android device.

11.     In addition, based on my training and experience, I know that Google offers numerous apps and online-based services, including messaging and calling (e.g., Gmail, Hangouts, Duo, Voice), navigation (Maps), search engine (Google Search), and file creation, storage, and sharing (e.g., Drive, Keep, Photos, and YouTube).  Many of these services are accessible only to users who have signed into their Google accounts.  An individual can obtain a Google account by registering with Google, and the account identifier typically is in the form of a Gmail address (e.g., example@gmail.com).  Other services, such as Maps and YouTube, can be used with limited functionality without the user being signed into a Google account.

12.     Based on my training and experience, I also know Google offers an Internet browser known as Chrome that can be used on both computers and mobile devices.  A user has the ability to sign-in to a Google account while using Chrome, which allows the user's bookmarks, browsing history, and other settings to be uploaded to Google and then synced across the various devices on which the subscriber may use the Chrome browsing software, although Chrome can also be used without signing into a Google account.  Chrome is not limited to mobile devices running the Android operating system and can also be installed and used on Apple devices and Windows computers, among others.

13.     Based on my training and experience, I know that, in the context of mobile

devices, Google's cloud-based services can be accessed either via the device's Internet browser or via apps offered by Google that have been downloaded onto the device. Google apps exist for, and can be downloaded to, devices that do not run the Android operating system, such as Apple devices.

14.     According to my training and experience, as well as open-source materials published by Google, I know that Google offers accountholders a service called "Location History," which authorizes Google, when certain prerequisites are satisfied, to collect and retain a record of the locations where Google calculated a device to be based on information transmitted to Google by the device. That Location History is stored on Google servers, and it is associated with the Google account that is associated with the device. Each accountholder may view their Location History and may delete all or part of it at any time.

15.     Based on my training and experience, I know that the location information collected by Google and stored within an account's Location History is derived from sources including GPS data and information about the wi-fi access points and Bluetooth beacons within range of the device. Google uses this information to calculate the device's estimated latitude and longitude, which varies in its accuracy depending on the source of the data. Google records the margin of error for its calculation as to the location of a device as a meter radius, referred to by Google as a "maps display radius," for each latitude and longitude point.

16.     Based on open-source materials published by Google and my training and experience, I know that Location History is not turned on by default. A Google accountholder must opt-in to Location History and must enable location reporting with respect to each specific device and application on which they use their Google account in order for that usage to be recorded in Location History. A Google accountholder can also prevent additional Location

History records from being created at any time by turning off the Location History setting for their Google account or by disabling location reporting for a particular device or Google application.  When Location History is enabled, however, Google collects and retains location data for each device with Location Services enabled, associates it with the relevant Google account, and then uses this information for various purposes, including to tailor search results based on the user's location, to determine the user's location when Google Maps is used, and to provide location-based advertising.  As noted above, the Google accountholder also has the ability to view and, if desired, delete some or all Location History entries at any time by logging into their Google account or by enabling auto-deletion of their Location History records older than a set number of months.

17.     Location data, such as the location data in the possession of Google in the form of its users' Location Histories, can assist in a criminal investigation in various ways.  As relevant here, I know based on my training and experience that Google has the ability to determine, based on location data collected and retained via the use of Google products as described above, devices that were likely in a particular geographic area during a particular time frame and to determine which Google account(s) those devices are associated with.  Among other things, this information can indicate that a Google accountholder was near a given location at a time relevant to the criminal investigation by showing that his/her device reported being there.

18.     Based on my training and experience, I know that when individuals register with Google for an account, Google asks subscribers to provide certain personal identifying information.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and

experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, this information often provide clues to their identity, location, or illicit activities.

19.     Based on my training and experience, I also know that Google typically retains and can provide certain transactional information about the creation and use of each account on its system. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, Google often has records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

20.     Google assigns an "anonymized" number, known as the Device ID, to a device, and the location data associated with a Device ID is never deleted.  These data are available to law enforcement through the issuance of a probable cause search warrant.  To obtain this information, Google requires a timeframe and general location, established either through a latitudinal/longitudinal point with a given radius or a polygon-shaped area with the latitude and longitude for each point of the polygon.

## BOSSMAN OUTDOORS FIREARMS THEFT

21.     Detective Teighlar Hendrick of the Haverhill, NH Police ("HPD"), and Corporal Michael DiDomenico of HPD have told me and S/A Dawley the following information:  On April 5, 2021, at approximately 6:23 AM, HPD responded to a burglary alarm at 24 Railroad Street, Woodsville, NH.  The building located at 24 Railroad Street contains two separate businesses to include a restaurant, Iron Rail Pub & Grill (hereinafter, the "Iron Rail") and a Federal firearms licensee, Bossman Outdoors (hereinafter, the "FFL").  The Iron Rail and the FFL have a common basement, separated by a metal door, into two distinct storage areas for each business. On April 5, 2021, upon arrival at the building at approximately 6:28 AM, HPD personnel observed signs of forced entry through the top half of a double-hung exterior door on the basement level. The door was determined to lead into the Iron Rail storage area of the basement. HPD personnel immediately observed a partial footprint located on a speaker box just inside of the broken door, as well as broken door latches.

22.     We also learned from HPD that HPD personnel proceeded to check the building for occupants, but none were located. HPD did, however, locate a box of 5,000 rounds of .22 Long Rifle caliber Armscor Ammunition on the Iron Rail side of the basement, near the metal door that separates the two sides of the basement. HPD personnel also located a moving dolly, containing an additional box of 5,000 rounds of .22LR caliber Armscor Ammunition and two (2) boxes of 5,000 rounds of .22LR caliber Aguilar Ammunition. HPD confirmed was Bossman Outdoors store employees that no employees had not loaded the aforementioned ammunition onto the dolly.

23.     Through conversations with involved law enforcement, store employees and through the examination of Iron Rail video surveillance, we learned the following: On or about

April 5, 2021 at approximately 6:13:19 AM, according to the timestamp[1] on the video surveillance, an unknown white male, approximately in his 20's or 30's (hereinafter, "Suspect #2"), dressed in a black hooded jacket/sweatshirt, black pants, light colored shoes with a dark soles, wearing what appear to be gloves, a brimmed hat and a dark backpack with a lighter colored accent, appeared from the southwest driveway of 14 Nelson Street, Woodsville, NH,[2] and crossed Nelson Street onto the northeast delivery driveway located in the rear of the Iron Rail. Suspect #2 covered his face with his hands as he walked by overt exterior cameras attached to the building.



*Figure 1: Suspect #2 – Walking behind 24 Railroad Street*

24.    At approximately 6:14:30 AM, Suspect #2 was observed on video surveillance at the rear door, later found by responding HPD personnel to have been damaged, and Suspect #2 goes out of view of the camera and inside of the building.

25.    At approximately 6:18:35 AM, Suspect #2 was observed opening the interior basement door into the FFL's main showroom. Suspect #2 walked around a glass firearms storage display with an unsecured rifle on top, went to the second rack of unsecured rifles and

---

[1] I learned the timestamp for the Iron Rail video surveillance was approximately 3 minutes ahead of the time shown on my government issued smartphone.

[2] 14 Nelson Street is a dwelling that has two driveways – one on the southwest side of the residence and one on the northeast side of the residence.

removed four (4) rifles, later determined to be three (3) Excel Arms X-22R .22 caliber rifles (serial numbers 110325, 110326, 110329) and one (1) Mossberg 715T .22 caliber AR-variant rifle (serial number ESG4317435).

26.     We observed the backpack to appear to contain additional contents than when initially observed in earlier video footage. Suspect #2 exited the first floor back into the basement at approximately 6:19:12 AM.



*Figure 2: Suspect #2 stealing four firearms off FFL rack*

27.     At approximately 6:26:47, Suspect #2 was observed exiting the same exterior door that he originally entered in through, carrying the four (4) rifles and a backpack containing unknown contents. Suspect #2 initially walked down the northeast driveway, abruptly jogged and crossed Nelson Street and walked up the northeast driveway of 14 Nelson Street, behind the residence and out of view of the cameras.



*Figure 3: Suspect #2 – Leaving 24 Railroad Street with four rifles*

28.      HPD personnel advised me that they believed a cellphone was used by Suspect #2 because Suspect #2 entered a windowless basement with no overhead lights on, and no visible headlamp or flashlight on Suspect #2's person. I observed video surveillance footage, dated April 5, 2021 at approximately 6:17:50 AM, inside of the Iron Rail.  The footage focuses on the first floor of the Iron Rail but I could see a light illuminating various parts of the basement. Based on the shadows and movement of the light, I believe the footage to be consistent with someone walking in the basement using a flashlight.  I personally observed the basement without lights on and was unable to see or navigate without the use of a flashlight. I know through my training, knowledge and experience that most major smartphone cellphones come equipped with a flashlight feature. I also know that most people carry a cellphone on their persons throughout their daily activities, to include during the commission of crimes. I believe it is more likely than not that the suspect would use a cellphone flashlight feature rather than a traditional flashlight, as a cellphone is more easily explained if encountered by persons or law enforcement, whereas a flashlight could be viewed as a burglarious tool.

## SUSPECT #1 INSIDE BOSSMAN OUTDOORS

29.      S/A Dawley learned through Jason Fullerton Jr. and Bruce Simonds, the sales

clerks of the FFL, and through the examination of video surveillance, that on Friday, April 2,

2021 at approximately 1:24 PM,[3] an individual (hereinafter, "Suspect #1") similar in description

to Suspect #2 had been a patron at the FFL. S/A Dawley learned that Suspect #1 was considered

suspicious by store employees due to the extended time Suspect #1 spent inside of the store

without purchasing or holding any items. Mr. Fullerton estimated Suspect #1 was inside of the

store for approximately 30 to 45 minutes. Mr. Fullerton stated Suspect #1 was wearing a black

backpack with a lighter colored accent with a blue water bottle attached to the side of the

backpack. Mr. Fullerton stated Suspect #1's face was covered by a neck gaiter.



*Figure 4: Suspect #1 - Entering FFL on 04/02/2021*

30.      Mr. Fullerton stated it was odd that Suspect #1 asked for a Ruger 10-22 .22

caliber rifle and was advised none were in stock. Mr. Simonds showed Suspect #1 an Excel

---

[3] I learned the timestamp for the FFL video surveillance was approximately 2 minutes behind the time shown on my government issued smartphone.

Arms X-22R .22 caliber rifle and a Mossberg 715T AR-variant .22 caliber rifle, and advised

Suspect #1 that both rifles accepted Ruger 10-22 magazines. According to Mr. Fullerton and Mr.

Simonds, the rifles shown to Suspect #1 were the same rifles stolen during the burglary by

Suspect #2.



*Figure 5: Suspect #1 holding .22 caliber rifle*

31.     According to Mr. Fullerton, Suspect #1 attempted to purchase two small folding

knives, however stated he did not have his wallet and subsequently left without paying.

According to Mr. Simonds, Suspect #1 made mention that he resided within a short walking

distance and pointed to the vicinity of 42 Railroad Street, Woodsville, NH (hereinafter, "42

Railroad Street"). S/A Dawley observed the video surveillance and observed Suspect #1 exit the

FFL and walk along Railroad Street in front of Iron Rail, while on a cellphone and walked out of

view of the camera towards the vicinity of 42 Railroad Street.

32.     I know that members of criminal groups often communicate via smartphone

cellphones to plan and organize their activities. I also know that smartphone cellphones often

have the capabilities to hold location data through external providers and on the physical phones

themselves.

33.     According to Google Earth, the front door of the FFL and the front door of 42 Railroad Street are approximately 475 feet apart:



34.     On April 5, 2021, I learned from Jeffrey Elliot, the owner of the building located at 24 Railroad Street, that on April 2, 2021 at approximately 12:00 PM, he observed a male in a black jacket chopping wood in front of 42 Railroad Street. Mr. Elliot stated he had remotely observed video surveillance footage from the burglary and stated the male he observed chopping wood "resembled" Suspect #2.

## 42 RAILROAD STREET, WOODSVILLE, NH

35.     I learned from Detective Hendrick and Corporal DiDomenico that the route of travel by Suspect #2, both arriving and leaving the scene of the crime was down both driveways of 14 Nelson Street. According to Corporal DiDomenico, both routes would converge on a path that lead directly to the backyard of 42 Railroad Street. ATF SA Dawley and I walked the routes traveled by Suspect #2 and observed a wooded area, accessible by foot where a blue tarp is readily observed. According to Corporal DiDomenico, the blue tarp is located in the backyard of 42 Railroad Street. S/A Dawley later confirmed via video surveillance that any person attempting

14

to access the roadway from behind 14 Nelson Street would likely be recorded via exterior video

cameras unless they traveled in the wooded area that lead to the rear of 42 Railroad Street.



36.     Detective Hendrick and Corporal DiDomenico stated the address of 42 Railroad

Street is a commonly visited address for calls for service by HPD. Numerous recent

investigations and arrests have occurred at 42 Railroad Street, to include but not limited to:

medical calls such as drug overdoses, suspicious persons, drug activity and welfare checks.

37.     Corporal DiDomenico and I reviewed body camera footage of Corporal

DiDomenico's route of travel and response to the burglary alarm at 24 Railroad Street on April

5, 2021. Corporal DiDomenico drove past 42 Railroad Street via Central Street (NH-Route 302),

which runs parallel with Railroad Street. Corporal DiDomenico had an unobstructed view of the

residences on Railroad Street between Highland Street and Nelson Street and stated he did not

observe any persons walking in the area. Based upon the lack of persons walking in the area, I

believe it is more than likely that Suspect #2 traveled behind 14 Nelson Street and through the

wooded path, which would lead Suspect #2 to the rear of 42 Railroad Street.

## SOURCE OF INFORMATION #1

38.     On April 6, 2021 at approximately 6:30 AM, HPD Corporal DiDomenico arrested Source #1 for possession of controlled substances. During the arrest, Corporal DiDomenico asked Source #1 if they wished to speak to investigators regarding the stolen firearms. ATF SA Dawley and I spoke with Source #1 at the HPD booking room, where Corporal DiDomenico read and provided Source #1 with a Miranda Form prior to being interviewed. Source #1 stated they understood their rights and wished to speak to investigators.

39.     Source #1 wished to cooperate and provide information to law enforcement to seek favorable consideration for pending felony possession of controlled substance charges. According to Corporal DiDomenico, Source #1 had never previously cooperated with law enforcement. According to Source #1, they wished to provide information due to the fact that firearms were stolen and it was plausible that the firearms could be used against Source #1 or their associates in a drug-related robbery and/or against law enforcement such as Corporal DiDomenico or ATF agents investigating the burglary.  Based on my personal interaction with Source #1, I found Source #1 to be candid and credible.

40.     Source #1 has the following criminal convictions:

    a.   Forgery (Felony) – Convicted 10/02/2015

    b.   Theft – Unauthorized Taking – Convicted 10/02/2015

    c.   Violation of Probation – Convicted 08/18/2016

    d.   Theft – Unauthorized Taking – Conviction 05/31/2018

    e.   Receiving Stolen Property (Felony) – Convicted 07/05/2018

    f.   Violation of Protection Order – Convicted 10/22/2020

41.     Source #1 advised investigators they visited 42 Railroad Street on April 5, 2021.
Source #1 advised they spoke to Peter SMITH, the owner of the property. According to Source
#1, SMITH stated "shit had happened at the residence" in reference to four (4) stolen "22's"
from the FFL. Source #1 stated they spoke with Brandon SWAINE, who stated a male, possibly
by the name of "Nick," had committed the burglary and brought the firearms back to 42 Railroad
Street. I believe "Nick" to be Suspect #2. Source #1 stated they did not know "Nick"/Suspect
#2's true identity and stated "Nick"/Suspect #2 was not at 42 Railroad Street when they were
there. Source #1 was unsure whether the firearms were currently located at 42 Railroad Street,
but believed they were not.

42.     Source #1 stated they had previously lived at 42 Railroad Street for a significant
amount of time in 2020 and 2021. Source #1 stated they were upset with the residents of 42
Railroad Street because their belongings and cash had been stolen while being hospitalized for
drug related complications. Source #1 had intimate knowledge of the residents who lived there,
to include: Peter SMITH, Brandon SWAINE, Crystal TOWLE, Julie ROY, Jordan JOHNSON
and Jonathan JACOB.

43.     I reviewed the criminal histories of the aforementioned residents of 42 Railroad
Street and learned the following persons had the following criminal histories:

    a.   Jordan JOHNSON:

        i.   Manufacturing Methamphetamine – Convicted 03/07/2017

        ii.   Criminal Threatening (Firearm) – Open Case 03/16/2021

        iii.   Theft by Unauthorized Taking x2 Priors (Felony) – Open Case 03/16/2021

        iv.   Willful Concealment x2 Priors (Felony) – Open Case 03/16/2021

   b.  Jonathan JACOB:

      i.  Violation of Probation – Convicted11/18/2003

      ii.  Burglary (Felony) – Unknown Disposition 03/22/2012

      iii.  Receiving Stolen Property (Felony) – Convicted 05/01/2014

      iv.  Burglary (Felony) – Convicted 05/01/2014

      v.  Forgery (Felony) – Convicted 05/01/2014

      vi.  Bail Jumping (Felony) – Convicted 05/01/2014

      vii.  Theft by Deception x2 Prior (Felony) – Convicted 05/01/2014

      viii.  Violation of Probation (Felony) – Convicted 08/10/2017

   c.  Julie ROY

      i.  Possession of Heroin/Crack Cocaine – Open Case

   d.  Brandon SWAINE

      i.  Two (2) active State of New Hampshire Electronic Bench Warrants

## **SOURCE OF INFORMATION #2**

44.    On March 26, 2021 at approximately 12:35 PM, New Hampshire Information & Analysis Center (NHIAC) Intelligence Officer John Lepkowski took a report from Source #2 on the "See Something, Say Something" Tip Line. Source #2 provided their identity to Officer Lepkowski and provided the following information: On or about March 26, 2021, Source #2 was eating at the Iron Rail and observed Crystal TOWLE walk up to a blue colored Jeep Liberty bearing an unknown registration, make what is described as a hand-to-hand transaction, which lasted approximately a few seconds, and walked away. Source #2 recognized Crystal TOWLE because they lived in close proximity of each other, in or around 42 Railroad Street. Source #2 stated they believed TOWLE was involved in distributing methamphetamine. According to the

tip, Source #2 described Crystal TOWLE as living in a camper/trailer located on Railroad Street. On April 5 and 6, 2021, I observed a large camper parked on the front lawn of 42 Railroad Street.

45.     On April 6, 2021, Detective Hendrick spoke with Source #2 via telephone. Source #2 stated they knew Crystal TOWLE and Brandon SWAINE lived at 29 Railroad Street, Apartment #3 from approximately October 2020 until December 2020. Source #2 stated they knew that Crystal TOWLE and Brandon SWAINE now lived at the house with the camper on the front lawn and "trash all over," which investigators readily identified as 42 Railroad Street. Source #2 stated during the duration that Crystal TOWLE and Brandon SWAINE lived at 29 Railroad Street, Apartment #3, they observed both parties make hand-to-hand transactions approximately fifteen to sixteen times. Source #2 stated they believed the hand-to-hand transactions were drug related based upon knowing Crystal TOWLE and Brandon SWAINE were heavy drug users, based upon their actions and based upon their life experience and general knowledge of what they perceived to be drug transactions.

46.     Source #2 stated they had observed a white male with a "scraggily beard and dark hair," who always had a black backpack who lived on the property of 42 Railroad Street. Source #2 stated they had observed the unknown male frequent, and possibly live at 42 Railroad Street for approximately three months.

47.     S/A Dawley ran Source #2's criminal history, and there were no records on file.  I am not aware of any pending charges against Source #2, and Source #2 was not cooperating to receive consideration for pending charges and was not being paid for providing information.  I believe Source #2 provided information to law enforcement simply as a concerned citizen.

## FEDERAL SEARCH WARRANT – 42 RAILROAD STREET

48.     On April 7, 2021, at approximately 7:00 AM, S/A Dawley applied for and was granted a Federal search warrant for 42 Railroad Street by the Honorable Judge Johnstone of the District of New Hampshire. On the same day at approximately 2:00 PM, the Federal search warrant was executed at 42 Railroad Street, where officers located ammunition, firearms accessories, drug paraphernalia, a cellphone, and articles of clothing matching that worn by Suspect #2 during the burglary on April 5, 2021.

## SOURCE OF INFORMATION #3

49.     During the execution of the Federal search warrant on April 7, 2021, Source #3 was located inside of the recreational vehicle located at 42 Railroad Street and was temporarily detained. Source #3 was advised they were not under arrest. Source #3 stated that they wished to cooperate and provide information to law enforcement to distance themselves from any involvement in the FFL burglary and to seek favorable consideration for possible felony possession of drugs and firearms charges.  This also included Source 3 written consent to search the vehicle he was in possession of and his cell phone. HPD Corporal DiDomenico and I learned the following information during our interview of Source #3:

50.     Source #3 stated a male known to them as "Derek Jenkins," identified as Derek HACKETT, and his girlfriend, later identified as Nichole CLOUTIER, had stayed at 42 Railroad Street on the evening of April 4, 2021. HACKETT and CLOUTIER were sleeping in the smaller camper in the backyard of 42 Railroad Street.

51.     Source #3 showed me the Facebook profile of "Derek Jenkins" and consented to a review of Facebook conversations between the two of them. The conversations contained contents related to drug sales from HACKETT to Source #3.

20

52.     Source #3 stated they purchased heroin from HACKETT approximately ten times and definitively on April 4, 2021 and that they communicated with HACKETT via Facebook since at least February 13, 2021. Source #3 stated they were aware HACKETT had Facebook on his cellphone. Source #3 advised law enforcement that HACKETT had left a cellphone in the camper, located in the backyard of 42 Railroad Street.  Source #3 advised the cellphone was now in his vehicle.  Source #3 stated that he had a conversation at some point with HACKETT regarding the blue Motorola (model unknown) Smartphone and activating the phone.  Source #3 said he did not know where HACKETT got the phone.

53.     During the consent search of Source #3 vehicle, a blue Motorola (unknown model) smartphone was located in Source #3 vehicle.

54.     I reviewed the criminal history of Derek HACKETT and observed the following felony convictions:

     a.  Burglary (x2 counts) – Convicted 03/06/2008

     b.  Grand Larceny – Convicted 03/06/2008

     c.  Burglary – Occupied Dwelling – Convicted 04/16/2010

     d.  Burglary – Occupied Dwelling – Convicted 09/15/2015

     e.  Aggravated Assault – Convicted 09/15/2015

     f.  Domestic Violence Assault – open case (10/30/2020)

55.     Source #3 stated HACKETT advised them that he had access to firearms and had friends who had firearms, which in hindsight, Source #3 stated they believed HACKETT was talking about committing the burglary and gaining access to firearms.

21

## SOURCE OF INFORMATION #4

56.     During the execution of the Federal search warrant, Source #4 arrived on scene and approached law enforcement and voluntarily spoke with myself and HPD Corporal DiDomenico. HPD Corporal DiDomenico and I learned the following information during the recorded interview with Source #4:

57.     Source #4 identified HACKETT and CLOUTIER by their Facebook profiles.

58.     Source #4 advised that they had heard "Derek Jenkins" was known as "Hackett", but did not know his real name.

59.     Source #4 stated they knew HACKETT and CLOUTIER for approximately a few weeks.

60.     Source #4 stated HACKETT and CLOUTIER both used methamphetamine and "dope," which through my training, knowledge and experience, I knew to mean heroin/fentanyl. Source #4 stated HACKETT sold heroin.

61.     Source #4 stated HACKETT and CLOUTIER had stayed at 42 Railroad Street for two nights, since approximately April 3, 2021. Source #4 specifically stated HACKETT had overdosed at 42 Railroad Street on April 3, 2021 and that they assisted in reviving HACKETT, without professional medical attention.

62.     Source #4 stated HACKETT approached them inside the residence of 42 Railroad Street on the morning of April 5, 2021 and asked them to burn a black backpack without providing a reason as to why. Source #4 stated later in the morning they walked to deliver a coffee and while on Nelson Street they were approached by Corporal DiDomenico in regards to the burglary that had occurred at the gun store, which I know to be Bossman Outdoors.

63.     Upon returning to 42 Railroad Street later that morning, Source #4 observed HACKETT inside of the kitchen of the residence and confronted him by saying something to the effect "I know what you did, take your backpack and leave" and specified to HACKETT that they knew HACKETT committed the gun store burglary. According to Source #4, HACKETT denied any involvement and subsequently left the residence.

64.     Source #4 stated they followed HACKETT out of the residence shortly after the confrontation. Source #4 followed HACKETT into a "black jeep Cherokee," described to have a Vermont registration. Source #4 stated CLOUTIER was operating the Jeep and that HACKETT was a front passenger. Source #4 stated to HACKETT "I know you did the burglary." According to Source #4, HACKETT laughed, and HACKETT neither confirmed nor denied his involvement.

65.     S/A Dawley learned from New Hampshire State Police ("NHSP") Trooper Timothy Larrabee and Piermont, NH Police Chief Brandon Alling that HACKETT was a suspect in a car theft ring operating in New Hampshire and Vermont.

66.     S/A Dawley learned through conversation with Windsor, VT Police Sergeant Detective Kevin Blanchard, HPD Corporal DiDomenico and reviewed the associated WPD and HPD reports, that on April 3, 2021, a 2016 gray Jeep Compass, bearing Vermont registration HYB739 was reported stolen by the registered owner, Ashley Hall. According to the reports, Ms. Hall stated she provided the vehicle to CLOUTIER and HACKETT and had done so on previous occasions. Ms. Hall contacted HPD directly and advised HACKETT lived in Woodsville, NH but could not provide the exact address. According to HPD records and the WPD report, HPD Officer Mitchell located the vehicle at 42 Railroad Street on or about April 4, 2021.

67.     Source #4 stated on April 6, 2021, at approximately 5:38 PM, CLOUTIER texted them "hey got work" and "I got work!!!". Source #4 stated "work" was in reference to illegal drugs.

68.     Source #4 stated on April 6, 2021, at approximately 9:03 PM, they received a Facebook messenger audio call from CLOUTIER that lasted approximately 1 minute and 22 seconds. CLOUTIER stated they, in reference to CLOUTIER and HACKETT, were in Boston at a Walmart and needed a ride.

69.     Source #4 stated HACKETT usually wore a dark hooded sweatshirt. I asked Source #4 what kind of personal protective equipment HACKETT wore in public. Source #4 stated HACKETT wore a neck gaiter. I asked Source #4 regarding what kind of shoes HACKETT wore. Source #4 initially stated white and/or black sneakers and then stated "muck boots".

70.     S/A Dawley ran Source #4's criminal history, and there were no records on file.  I am not aware of any pending charges against Source #4. Source #4 was not being paid for providing information. I believe Source #4 was cooperating with law enforcement to distance themselves from any involvement with the FFL burglary.

## PREVIOUS GEOFENCE WARRANT

71.     On April 30, 2021, S/A Dawley obtained a search warrant from the USDC in Concord, NH for a Google Geofence warrant for two separate target locations; Location #1 was 24 Railroad Street, Woodsville, NH (the Bossman Outdoors FFL and the Iron Rail Pub and Grille) and location #2 was 42 Railroad Street, Woodsville, NH.  Multiple timeframes were requested for both locations.  Each location was defined by a virtual box around the locations with each corner of the box having a GPS location.

72.     On May 4, 2021, this affiant submitted the Google Geofence search warrant to Google via Google's Law Enforcement Request System (LERS) portal.

73.     On May 24, 2021, this affiant was notified by Google that one of the GPS coordinates related to the request for location #1 was skewed and the requests for that location would have to be based on only three of the four GPS locations or a new warrant would have to be requested with updated GPS coordinates.  This affiant requested that Google complete the search warrant request with just the three GPS coordinates.

74.     On that same day, this affiant reviewed the GPS coordinates for Location #1 and noted that the triangle created by only using GPS coordinates one through three, created a triangle that does not cover the physical location of the Bossman Outdoors FFL.

75.     The results received from the initial warrant indicate that a device associated with the e-mail address hackettderek3@gmail.com was in the area of 42 Railroad Street on April 2, 2021 between approximately 2 and 3 pm.

## **TECHNICAL INFORMATION**

71.     On May 26, 2021, I identified the following coordinates for Target Location #1, which included 24 and 42 Railroad Street in the town of Woodsville, NH.  Target Location #1 is the geographical area identified as a polygon defined by the following latitude/longitude coordinates and connected by straight lines:



Point 1: 44.151355, -72.036129

Point 2: 44.149569, -72.034939

Point 3: 44.149927, -72.033919

Point 4: 44.150836, -72.033925

Point 5: 44.151906, -72.035158

72.     The information is being requested during the following time periods in which investigators believe the suspect may have previously visited the FFL, on April 2, 2021 from 12:00 PM through 3:00 PM, and when the burglary occurred, on April 5, 2021 from 5:00 AM through 7:00 AM.  All times are in the Eastern time zone.

73.     This application requests a warrant as the first step of a two-step process.  The data being provided in the execution of the requested warrant is anonymized.  Google would only provide the "Device ID" information and there is no method for this affiant or other law

enforcement investigators to identify the related user(s) of the device(s) with this information alone.  Once the data have been received from Google, investigators will process the data to identify any "Device ID(s)" that appear to be related to the specific crime being investigated, based on the presence or absence of the devices at specific times.  If relevant "Device ID(s)" are identified, an application for a second search warrant related to the specific "Device ID(s)" that were discovered will be submitted to seek additional identification information in reference to those "Device ID(s)."  This additional information may include: owner/user identifiers, extended location history, and/or additional device identifiers.

## **CONCLUSION**

Based on the foregoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, and because this warrant seeks only permission to examine electronic records and does not involve the intrusion onto physical premises, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.


/s/ John Forte
John Forte
Special Agent, ATF


The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.


Date: June 8, 2021
Time: 2:18 PM, June 8, 2021

Hon. Andrea K. Johnstone
United States Magistrate Judge

27

## **ATTACHMENT A**

### **Property To Be Searched**

This warrant is directed to Google LLC and applies to:

(1) Location History data, sourced from information including GPS data and information about visible wi-fi points and Bluetooth beacons transmitted from devices to Google, reflecting devices that Google calculated were or could have been (as indicated by margin of error, *i.e.,* "maps display radius") located within the geographical region bounded by the latitudinal and longitudinal coordinates, dates, and times below ("Initial Search Parameters"); and

(2) identifying information for Google Accounts associated with the responsive Location History data.

### Initial Search Parameters

<u>Search Parameter 1</u> – The area around 24 and 42 Railroad Street, Woodsville, New Hampshire

- Date: Friday, April 2, 2021

- Time Periods (including time zone):
  - 12:00 PM EST through 3:00 PM EST

- Target Location:   Geographical area identified as:

  - A polygon defined by the following latitude/longitude coordinates connected by straight lines:



Point 1: 44.151355, -72.036129

Point 2: 44.149569, -72.034939

Point 3: 44.149927, -72.033919

Point 4: 44.150836, -72.033925

Point 5: 44.151906, -72.035158

Search Parameter 2 – The area around 24 and 42 Railroad Street, Woodsville, New Hampshire

- Date: Monday, April 5, 2021

- Time Periods (including time zone):
  o 5:00 AM EST through 7:00 AM EST

- Target Location:   Geographical area identified as:

  o A polygon defined by the following latitude/longitude coordinates connected by straight lines:



Point 1: 44.151355, -72.036129

Point 2: 44.149569, -72.034939

Point 3: 44.149927, -72.033919

Point 4: 44.150836, -72.033925

Point 5: 44.151906, -72.035158

## ATTACHMENT B

### Particular Items to Be Seized

**I.      Information to be disclosed by Google**

The information described in Attachment A, via the following process:

1.      Google shall query location history data based on the Initial Search Parameters specified in Attachment A.  For each location point recorded within the Initial Search Parameters, and for each location point recorded outside the Initial Search Parameters where the margin of error (*i.e.*, "maps display radius") would permit the device to be located within the Initial Search Parameters, Google shall produce to the government information specifying the corresponding unique device ID, timestamp, location coordinates, display radius, and data source, if available (the "Device List").

2.      The government shall review the Device List and identify to Google the devices about which it seeks to obtain Google account identifier and basic subscriber information.  The government may, at its discretion, identify a subset of the devices.

3.      Google shall disclose to the government identifying information, as defined in 18 U.S.C. § 2703(c)(2), for the Google Accounts associated with each device ID appearing on the Device List about which the government inquires.

## II.      Information to Be Seized

All information described above in Section I that constitutes evidence of violations of Title 18, United States Code, Sections 2 and 924(m), conspiracy and theft of firearm(s) from a Federal firearms licensee, have been committed on April 2, 2021 and April 5, 2021 involving unknown person(s).